## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KAREN WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 03 C 2994 |
| | ) |
| CITY OF CHICAGO, | ) Judge Ruben Castillo |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Karen Williams brought a two count complaint against the City of Chicago ("the City"), under Title VII of the Civil Rights Act of 1964, for subjecting her to a hostile work environment and for retaliating against her after she complained about her work environment. This Court permitted Williams's hostile work environment claim to proceed to trial, but entered a judgment in favor of the City on Williams's retaliation claim because Williams failed to establish a *prima facie* case of retaliation. The jury returned a verdict in Williams's favor and awarded her four thousand dollars in actual damages and seventy-five thousand dollars in compensatory damages. The City seeks a judgment as a matter of law or a new trial. For the reasons provided below, we wholly deny the City's motions. (R. 120-1; R. 121-1.)

### LEGAL STANDARDS

A renewed motion for judgment as a matter of law is analyzed identically to a summary judgment motion except at this stage of the proceeding we "know exactly what evidence the jury considered in reaching its verdict." *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004). Instead of determining whether a material disputed fact warrants a trial, we determine whether the jury's verdict was supported by a "legally sufficient evidentiary basis."

Fed. R. Civ. P. 50. "A legally sufficient amount of evidence need not be overwhelming, but it must be more than a 'mere scintilla.'" *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004) (quoting *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000)). We draw all reasonable inferences in favor of the prevailing party so cannot weigh the evidence nor make any credibility determinations. *Harvey*, 377 F.3d at 707. We also disregard all evidence favorable to the moving party. *Id.* We will only enter a judgment as a matter of law if the evidence did not permit a rational jury to find for the prevailing party. *Id.*

A motion for a new trial can only be granted in two circumstances. First, it should be granted if the verdict was against the manifest weight of the evidence. *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004). Having overseen the trial, this Court is uniquely qualified to determine the manifest weight of the evidence by considering the credibility of the witnesses. *See Thomas v. Stalter*, 20 F.3d 298, 304 (7th Cir. 1994). Second, a motion for a new trial should be granted if any of this Court's trial rulings affected the "substantial rights of the parties." Fed. R. Civ. P. 61. An erroneous ruling only affects a party's substantial rights if it had a "substantial influence over the jury." *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997).

## ANALYSIS[1]

### I. Judgment as a Matter of Law

The City asserts that it is entitled to a judgment as a matter of law because this Court misapplied the continuing-violation doctrine and because the jury's verdict lacks a "legally sufficient evidentiary basis." For the reasons provided below, we deny the City's motion for a judgment as a matter of law on both grounds.

---

[1] This Court's summary judgment opinion contains a thorough overview of the relevant facts. *See Williams v. City of Chi.*, 325 F. Supp. 2d 867 (N.D. Ill. 2004).

2

## A.          The Continuing-Violation Doctrine

An employer who subjects an employee to a hostile work environment, regardless of the amount of conduct involved, has engaged in a single unlawful employment practice. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-18 (2002); *Lucas v. Chi. Tran. Auth.*, 367 F.3d 714, 724 (7th Cir. 2004). Under the continuing-violation doctrine, all the conduct that created the hostile work environment is actionable if some of the conduct was timely because, as long as the offensive and discriminatory conduct persists, the employer continues to engage in the single unlawful employment practice. *Id.* The statute of limitations, however, can begin to run if an "intervening event by the employer" ends the unlawful employment practice. *Id.* Once the unlawful employment practice is over, the employer would be engaging in a second, different unlawful employment practice were it to subject the same employee to another hostile work environment. Under these circumstances, the employee would have two independent claims, and some of the conduct creating each hostile work environment must be timely for each claim to be actionable. *Id.*

The City asserts that this Court erred in deciding at the summary judgment stage that the Homan Square conduct and the Area 2 conduct are part of a single hostile work environment created by the same unlawful employment practice. The City claims that Williams's transfer from Homan Square to Area 2 was an "intervening event" that terminated the hostile work environment to which Williams was subjected to at Homan Square. While the City never stated why our continuing-violation ruling entitles it to a judgment as a matter of law, we can only presume that it is contending that no rational jury could have found in Williams's favor without

3

hearing about the Homan Square conduct.[2] We question this contention, but do not need to address it because the evidence presented at trial squarely affirmed our summary judgment ruling. For the reasons provided below, we find that the Homan Square conduct was actionable and admissible because it was part of a single unlawful employment practice that existed in both Homan Square and Area 2.

The evidence presented at trial demonstrated that Williams's work environment was hostile at Homan Square and Area 2 because of a single unlawful employment practice: the maintenance of a work environment in which women are objectified as objects of sexual desire. As a result of this unlawful employment practice, Williams was regularly exposed to discriminatory, offensive pornography and occasionally subjected to discriminatory, offensive comments and ridicule.[3] This unlawful employment practice continued despite complaints made

---

[2] Even though the evidence presented at trial was virtually identical to the evidence identified at the summary judgment stage and the arguments presented in this motion are virtually identical to the arguments presented in the City's summary judgment motion, (see R. 27-1, Sum. J. Mot. at 1), the City has re-raised the continuing-violation doctrine issue because it contends that Williams "failed to prove that any treatment at Homan Square was part of a continuing violation," (R. 120-2, Def.'s Mem. at 2). Although we have already fully addressed this argument, see Williams, 325 F. Supp. 2d at 875, we do so again for the sake of completeness and to supplement the reasoning provided in our summary judgment opinion.

[3] Williams testified that Officer Heinosch regularly viewed pornography on the computer directly behind her and that she regularly saw pornography or evidence that pornography had been viewed in Area 2. (Tr. Transcript, Williams Testimony at 77, 79, 128, 130.) She described several of the pornographic images she saw. (Id. at 75, 76, 127-28, 129.) She also testified that she saw links to child pornography websites on an Area 2 computer. (Id. at 129.) Detective Healy testified that Williams's immediate co-workers would laugh and "horse around" while watching pornography together in the office. (Id., Healy Testimony at 542.) Detective Besteda testified that she "probably" told a federal investigation that she saw pornography on Area 2 computers. (Id., Besteda Testimony at 251-58.)

Williams testified that Officer Heinosch asked her, after showing her a picture of a female arrestee, if she thought that the woman "takes it up the ass." (Id., Williams Testimony at 84.) She testified that Sergeant Caluris ridiculed her when she complained about Officer Heinosch's

4

by Williams and others and despite conduct that was so open, so pervasive, and so severe that it is reasonable to infer that City should have known about the practice.[4] This unlawful employment practice of objectifying women as objects of sexual desire was maintained at both Homan Square and Area 2, so the continuing-violation doctrine makes the Homan Square conduct both actionable and admissible.

Despite the fact that Williams was subjected to substantially the same conduct at Homan Square and Area 2, the City asserts that her transfer from Homan Square to Area 2 was an "intervening event" that terminated the unlawful employment practice she was subjected to at Homan Square.[5] The City first focuses on the physical location of these two offices. An

---

conduct. (*Id.* at 89.) She also testified that detectives laughed at her when she accidentally found pornography on a computer. (*Id.* at 127-28.)

[4] Williams testified that her complaints were not addressed until she complained five times to four different supervisors. *See* Section I (B)(4), *infra*, for a detailed description of her complaints and her supervisors' responses. Detective Besteda testified that she "probably" told a federal investigator that she had complained to her supervisor about pornography. (Tr. Transcript, Besteda Testimony at 256.) Detective Novitovic testified that he found five thousand pornographic images on the single computer he analyzed forensically as well as a program designed to delete evidence of internet browsing. (*Id.*, Novitovic Testimony at 302, 307, 314.)

[5] The City cites several case—*Costanzo v. United States Postal Service*, No. 00 Civ. 5044(NRB), 2003 WL 1701998 (S.D. N.Y. Mar. 31, 2003), *Cox v. American Drug Stores*, No. 02 C 939, 2003 WL 1903985 (N.D. Ill. Apr. 17, 2003), and *Boebel v. Combined Insurance Company of America*, No. 02 C 1772, 2004 WL 144135 (N.D. Ill. Jan 16, 2003)—in which a transfer between work teams or conduct at different locations by different individuals precluded application of the continuing-violation doctrine. The application of the continuing-violation doctrine is extremely fact-specific, and all of the cases cited by the City are factually distinguishable. *Costanzo* is distinguishable because the court found that the plaintiff's transfer to a new team "clearly changed" the plaintiff's working conditions. 2003 WL 1701998, at *11. Williams's transfer, while it changed where she worked and who she worked with, did not change her exposure to internet pornography. *Cox* is distinguishable because the court found that conduct was unrelated because it was infrequent and concerned different subject-matters. 2003 WL 1903985, at *7. Williams was exposed to the same conduct on a regular basis. Finally,

employee's transfer to a new location is only an "intervening event," however, if the same unlawful employment practice (the conduct creating the hostile work environment) is not present in that new location. An unlawful employment practice is not limited by physical boundaries; to the contrary, it tends to spread wherever it is tolerated. The City next points to the different personnel at Homan Square and Area 2. The presence of different personnel, however, is only an "intervening event" if the new personnel did not subject the employee to the same unlawful employment practice. Finally, the City cites the different supervisors in Homan Square and Area 2.[6] A management change, however, is only an "intervening event" if the new management ends the unlawful employment practice. Thus, none of the changes in Williams's employment that the City relies on constitute an "intervening event" or indicates that Williams was subjected to two independent unlawful employment practices. To the contrary, different people in different locations engaging in the same type of discriminatory, offensive conduct that was similarly

---

*Boebel* is distinguishable because the court found that there was a "significant gap" between the untimely and timely conduct. 2004 WL 144135, at *3. Williams was transferred directly from Homan Square to Area 2. The only possible gap is the time—approximately six months—that Williams spent with enforcement team eight in Homan Square, which we do not view as significant. The *Boebel* decision is also unpersuasive because the court incorrectly relied on the plaintiff's awareness that she had a hostile work environment claim when determining the applicability of the continuing-violation doctrine. *Id.*; *see Morgan*, 536 at 117 n.11 (abrogating *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164 (7th Cir. 1996)); *see also Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 18 (1st Cir. 2002); *Boyler v. Cordant Techs., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003).

[6] The City fails to acknowledge that Williams had the same supervising commander—Commander Green—at both Homan Square and Area 2. (Tr. Transcript, Williams Testimony at 119.)

tolerated by different supervisors strongly indicates that Williams was subjected to a single

unlawful employment practice that spanned two Chicago Police Department offices.[7]

### B.    "Legally Sufficient Evidentiary Basis"

The City asserts that it is entitled to a judgment as a matter of law because the jury's

verdict lacks a "legally sufficient evidentiary basis." Fed. R. Civ. P. 50. A rational jury does

need to hear "overwhelming" evidence, but it does need to hear more than a "mere scintilla" of

evidence in order to render a verdict. *Filipovich*, 391 F.3d at 863; *Harvey*, 377 F.3d at 707.

The City contends that the jury heard insufficient evidence to find the following four facts:

(1)    the conduct that created Williams's hostile work environment was based on her sex;

(2)    a reasonable person in Williams's position would have found her work environment to be hostile;

(3)    the City of Chicago knew or should have known about the conduct that created Williams's hostile work environment; and

(4)    the City of Chicago did not take reasonable steps to rectify Williams's work environment.[8]

---

[7] Williams's transfer would have been an "intervening event" if the City had transferred her to Area 2 out of a sincere belief that she would no longer be subjected to the same unlawful employment practice at that location. *See Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1258-59 (11th Cir. 2003) (holding that an employer's act of ordering a co-worker to dispose of pornography was an "intervening event" because it ended the unlawful employment practice). Williams was transferred because of a departmental reorganization. Her transfer was not an affirmative attempt to end her exposure to an unlawful employment practice nor did it end her exposure to that practice. As a result, Williams's transfer did not constitute an "intervening event."

[8] The jury was instructed that a hostile work environment claim consists of the following seven elements:

(1) Williams was subjected to conduct that created a hostile or abusive work environment;

(2) the conduct was unwelcome;

(3) the conduct was based on her sex;

(4) at the time the conduct occurred, she believed that it created a hostile or abusive

For the reasons provided below, we find that Williams introduced sufficient evidence to permit a rational jury to find in her favor.

### 1. Sex-Based Conduct

The City asserts that Williams introduced no evidence that the conduct that made her work environment hostile was based on her sex. (R. 120-2, Def.'s Mem. at 6.) The City asserts that Williams failed to introduce evidence establishing that Officer Heinosch's offensive comment and the Area 2 detectives' laughter were based on Williams's sex. (*Id.* at 7.) The City speculates that Heinosch would have made the same offensive comment to a man and that the detectives would have laughed at anyone who accidentally discovered pornography on a computer. (*Id.*) For the following reasons, we disagree.

First, we must draw all reasonable inferences in Williams's favor. *Harvey*, 377 F.3d at 707. It is eminently reasonable to infer that this conduct was based on Williams's sex considering the pervasiveness and severity of internet pornography in the workplace. There is no evidence in the record to support the City's speculation about Officer Heinosch's comment or the detectives' laughter. Second, Williams was not required to bring direct evidence of Officer Heinosch's state of mind when he made this comment (which does not exist because Officer Heinosch denied that he made it) or of the detectives' states of mind when they laughed at

---

work environment;

(5) the conduct was sufficiently severe or pervasive that a reasonable person in her position would find her work environment to be hostile or abusive;

(6) the City of Chicago knew or should have known about the conduct; and

(7) the City of Chicago did not take reasonable steps to correct the situation.

(R. 114, Jury Instructions at 18.)

Williams. State-of-mind and intent are typically proven through circumstantial evidence. *Cf.*
*Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (stating that direct
evidence of intentional discrimination is "admittedly rare"). The record contains ample
circumstantial evidence that this conduct was based on Williams's sex. Finally, Williams's
exposure to pornography in the workplace is second-hand discriminatory conduct that was based
on her sex.[9] For all of these reasons, the evidence was more than sufficient to permit a rational
jury to find that the discriminatory conduct was based on Williams's sex.

### 2. The Reasonable Person Standard

The City next asserts that no rational jury could have found that Williams's work
environment was objectively hostile. An objectively hostile work environment is one that a
reasonable person would find to be hostile. *Smith*, 388 F.3d at 567. The jury was instructed that
it should determine whether Williams's work environment was objectively hostile by considering
"all the circumstances" including "the frequency of the conduct, its duration, whether it was
physically threatening or humiliating; and whether it unreasonably interfered with Ms.
Williams'[s] work performance." (R. 114, Jury Instructions at 13); *see also Smith*, 388 F.3d at
567. The City asserts that no reasonable person could have found that Williams's work

---

[9] Second-hand discrimination is discriminatory conduct that is not directed at the plaintiff.
*Smith*, 388 F.3d at 567. It can contribute to a hostile work environment, but is entitled to less
weight than first-hand discrimination (conduct that is directed at the plaintiff). The Seventh
Circuit even suggested in *Smith* that a hostile work environment could be based entirely on
second-hand discrimination. 388 F.3d at 657 ("We do not mean to hold that a plaintiff can never
demonstrate a hostile work environment through second-hand comments or in situations where a
plaintiff is not the intended target of the statements."); *see also Dandy*, 388 F.3d at 272 (stating
that repeated second-hand discrimination "may create an objectively hostile work environment").

environment was hostile because only two discriminatory acts were intentionally directed at her: Heinosch's comment and the detectives' laughter.

This argument completely ignores the second-hand discrimination to which Williams was subjected.[10] *Smith*, 388 F.3d at 567. Williams's unwilling exposure to pornographic images, which objectify women as objects of sexual desire, was second-hand discrimination. After considering both the first-hand and second-hand discrimination to which Williams was subjected, we conclude that the jury heard sufficient evidence to find that Williams's work environment was objectively hostile.[11]

---

[10] Several circuit courts, including the Seventh Circuit, have found that workplace pornography contributes to a sexually-hostile work environment. *See O'Rourke v. City of Providence*, 235 F.3d 713, 735 (1st Cir. 2001) (stating that workplace pornography is relevant to the plaintiff's hostile work environment claim); *Wolak v. Spucci*, 217 F.3d 157, 160-61 (2d Cir. 2000) (stating that workplace pornography, even if it inflicted a limited injury on the plaintiff, "might still alter [the plaintiff's] status in the workplace"); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997) (stating that workplace pornography contributed to the plaintiff's hostile work environment); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (noting that workplace pornography is a type of discriminatory conduct that can create a hostile work environment); *Andrews v. City of Phila.*, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (instructing trial judge to consider workplace pornography when determining whether a work environment is objectively hostile). Judges in this district have also regularly considered workplace pornography when determining whether a plaintiff alleged a sexually-hostile work environment. *See Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 03 C 885, 2004 WL 2453835, at *2 (N.D. Ill. Nov. 1, 2004) (Kennelly, J.); *Silverman v. Johnson*, No. 01 C 3594, 2004 WL 2044182, at *12 (N.D. Ill. Sept. 7, 2004) (Ashman, Mag. J.); *Wyrick v. City of Chi.*, No. 99 C 4777, 2003 WL 21823544, at *9 (N.D. Ill. Aug. 6, 2003 ) (Lefkow, J.); *Luttrell v. O'Connor Chevrolet, Inc.*, No. 01 C 0979, 2002 WL 1263990, at *4 (N.D. Ill. June 5, 2002) (Kocoras, J.); *Coniglio v. City of Berwyn, Ill.*, No. 99 C 4475, 2000 WL 967989, at *7 (N.D. Ill. June 15, 2000) (Lindberg, J.); *Harris v. City of Harvey*, 993 F. Supp. 1181, 1186 (N.D. Ill. 1998) (Levin, Mag. J.). A jury, therefore, can also consider workplace pornography when determining whether a plaintiff alleged a sexually-hostile work environment.

[11] This evidence is described in notes 4 and 5, *supra*.

This evidence is not "overwhelming" because it consists mostly of second-hand discrimination. The duration, severity, and frequency of the internet pornography to which Williams was exposed were of such magnitude, however, that a rational jury could have concluded that her work environment was objectively hostile. It is reasonable to infer that the City's failure to respond to Williams's repeated complaints compounded the hostility created by the discriminatory, offensive conduct to which she was subjected. The jury was presented with substantially more than a "mere scintilla" of evidence. Thus, a rational jury could have found that a reasonable person would have found Williams's work environment to be objectively hostile.[12]

### 3. Knew or Should Have Known

The City asserts that Williams failed to prove that it knew about the discriminatory conduct because no rational jury could have concluded that Williams made a concerted effort to inform her supervisors about it. (R. 120-2, Def.'s Mem. at 10.) *See Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). Williams complained—in compliance with the

---

[12] The City claims that the jury might have found that Williams's work environment was objectively hostile because of the evidence she introduced regarding post-complaint harassment. (R. 120-2, Def.'s Mem. at 9.) When deciding a motion for a judgment as a matter of law, we only consider whether there was sufficient evidence for a rational jury to find in favor of the plaintiff. *Harvey*, 377 F.3d at 707. We do not attempt to divine the evidence the jury actually relied on. Thus, the City's speculation is misplaced.

The City also claims that the jury's verdict was irrational because "no other female testified that the work environment at Homan Square or Area 2 was hostile." (R. 120-2, Def.'s Mem. at 9.) Williams was not required to prove that her co-workers found their work environment to be hostile. Remarkably, the City supports this argument with Detective Besteda's testimony. Detective Besteda testified that she never saw pornography at work, but *if she had* she would "probably not" be offended and "just glance and walk away." (*See* Tr. Transcript, Besteda Testimony at 260.) Credibility issues aside, her speculation about how she would react were she to see pornography at work is not remotely relevant to whether Williams's work environment was objectively hostile.

Chicago Police Department's sexual harassment policy, (Tr. Transcript, Skahill Testimony at 570-71)—five times to four different supervisors over a two-and-a-half year period.[13] It is reasonable to infer that Williams would have complained more had her supervisors not harassed her after her first few complaints.[14] The jury thus heard sufficient evidence to permit it to find that the City knew about Williams's situation.[15]

### 4. Reasonable Steps

The City asserts that no rational jury could have found that it did not take reasonable steps to address Williams's work environment. The evidence, viewed in the light most favorable to Williams, demonstrated that Williams complained about discriminatory conduct on five occasions: thrice at Homan Square and twice at Area 2. We must identify the steps that the City took in response to each complaint to determine whether the jury's verdict has a "legally sufficient evidentiary basis."

---

[13] *See* Section I (B)(4), *infra*, for a description of her complaints.

[14] *See* Section II (A), *infra*, for a description of the post-complaint harassment. (*See also* Tr. Transcript, Williams Testimony at 256 ("I had complained to Sergeant Cousins before, but prior to that, I was generating so much heat. Every day that I walked into work was an ambush, a change of assignment, a change of partner, a change of everything. I didn't want to keep generating heat."))

[15] The jury also heard enough evidence to conclude that the City should have known about much of the discriminatory conduct that was creating Williams's hostile work environment. First, Williams was not the only person who complained about internet pornography. Detective Besteda "probably" told a federal agent that she complained to her supervisor about pornography. (Tr. Transcript, Besteda Testimony at 256.) Second, Detective Novitovic found thousands of pornographic images on the single computer that he analyzed forensically. (Tr. Transcript, Novitovic Testimony at 314.)

### i. Williams's First Four Complaints

Williams testified that she told Sergeant Caluris on two occasions and Lieutenant Risley on one occasion about internet pornography and other offensive conduct. She testified that she told Sergeant Cousins about internet pornography. She testified that they responded to her complaints in the following ways:

- after she first complained about Officer Heinosch's conduct to Sergeant Caluris—who ridiculed her and disregarded her complaint—Williams told him that she would address Officer Heinosch herself, (Tr. Transcript, Williams Testimony at 89, 91, 183);

- after she complained in writing to Sergeant Caluris about Officer Heinosch's conduct, Sergeant Caluris changed his password, which prevented Officer Heinosch from using his computer to view pornography, ( Tr. Transcript, Williams Testimony at 104-07);

- after she complained to Lieutenant Risley about Officer Heinosch's conduct, Lieutenant Risley transferred her to a different team, which ended her exposure to Officer Heinosch, (Tr. Transcript, Williams Testimony at 113-14); and

- after she complained to Sergeant Cousins about child pornography links on a computer, Sergeant Cousins said that he removed the links, (Tr. Transcript, Williams Testimony at 137-39).

A rational jury could have found that the City failed to take reasonable steps to remedy Williams's work environment on each of these occasions. First, none of these actions ended Williams's exposure to internet pornography in the workplace. Second, her supervisors all testified Williams never complained but if she had the proper response would have been to initiate an investigation by obtaining a CR number. (Tr. Transcript, Caluris Testimony at 678-79; Risley Testimony at 637, 642; Cousins Testimony at 795-96.) It would be counter-intuitive to hold that they acted reasonably when they failed to take the actions that they stated were appropriate.

13

### ii. Williams's Final Complaint

Williams complained to Sergeant Wilkins on March 15, 2002, and Sergeant Wilkins promptly initiated an investigation by obtaining a CR number. (Tr. Transcript, Wilkins Testimony at 819-20.) The City asserts that this investigation reasonably addressed Williams's work environment, yet this investigation (even assuming that it terminated Williams's hostile work environment) does not absolve the City's failure to respond to Williams's first four complaints.[16] Thus, a rational jury could have concluded that an initiation of an investigation after Williams made five complaints over the course of nearly three years was unreasonable or, to put it simply—too little, too late. Accordingly, we find that the jury was presented with sufficient evidence to find that the City failed to take reasonable steps to remedy Williams's work environment.

In sum, the City is not entitled to a judgment as a matter of law because we properly applied the continuing-violation doctrine and because the jury's verdict has a "legally sufficient evidentiary basis." Accordingly, we deny the City's motion for a judgment as a matter of law.

---

[16] The parties spend considerable time discussing the reasonableness and effectiveness of the investigation. Viewing the evidence in the light most favorable to Williams, a rational jury could have concluded that the investigation—while ending Williams's exposure to internet pornography—did not reasonably address the unlawful employment practice of objectifying women as objects of sexual desire because it did not seek to identify any perpetrators or understand the true scope of the problem. (Tr. Transcript, Bialis Testimony at 364-58.)

14

## II.    New Trial

The City asserts that it is entitled to a new trial because four of this Court's rulings—three evidentiary rulings and one jury instruction ruling—affected its substantial rights.[17]  *See* Fed. R. Civ. P. 61.  The City asserts that this Court erroneously admitted the following evidence: (1) post-complaint harassment; (2) a To/From Memorandum; and (3) pornographic images.  A ruling that admits inadmissible evidence will affect a party's substantial rights if "a significant chance exists that [it] affected the outcome of the trial."  *Mihailovich v. Laatsch*, 359 F.3d 892, 914 (7th Cir. 2004) (quoting *Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 611 (7th Cir. 2002) (quoting *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000))).  The City also asserts that this Court erroneously rejected a limiting jury instruction on post-complaint harassment.  A ruling that rejects a proper jury instruction will affect a party's substantial rights if the absence of the rejected instruction was likely to confuse or mislead the jury.  *Boyd v. Ill. State Police*, 384 F.3d 888, 894 (7th Cir. 2004).  We determine the likelihood of confusion by considering all the jury instructions, evidence, and arguments.  *Id.*

---

[17] The City also claims that it is entitled to a new trial for all the "reasons discussed in [its] motion for a judgment notwithstanding the verdict," yet it does not endeavor to explain why the verdict is against the manifest weight of the evidence.  (R. 121-2, Def.'s Mem. at 1.)  We dismiss this argument almost as cursorily as it was made.  Williams was an extremely credible witness.  Her testimony was supported by Detective Healy's testimony, Detective Besteda's testimony, and Detective Novitovic's testimony.  A rational jury could have found her testimony to be truthful and appropriately discounted contradictory testimony, such as the testimony by her supervisors that she did not complain and the testimony by her co-workers that they never saw pornography.  After considering the credibility of the witnesses, we conclude that the jury's verdict is supported by the "manifest weight" of the evidence.  *See Smith*, 388 F.3d at 569.

## A.     Evidence of Post-Complaint Harassment

The City asserts that this Court erred by permitting Williams to introduce evidence that

Williams's supervisors harassed her after she complained about her hostile work environment.[18]

The City believes that the introduction of this evidence and the lack of its proposed limiting

instruction impermissibly enabled Williams to recast her dismissed retaliation claim as part of

her hostile work environment claim.  The Seventh Circuit in *Berry v. Delta Airlines, Inc.*, 260

F.3d 803, 810-11 (7th Cir. 2001), stated that post-complaint harassment has too remote a

connection to the plaintiff's sex to constitute sexual harassment.  Accordingly, the Seventh

Circuit declined to consider post-complaint harassment as part of the totality of circumstances

that can create a hostile work environment.  *Id.*  Post-complaint harassment, however, is still

relevant to whether an employer's response to a sexual harassment complaint was reasonable.

The Seventh Circuit stated that a court must consider an employer's "total response" to a sexual

harassment complaint to determine whether the employer's actions were "reasonably calculated

to prevent further harassment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir.

2004) (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (quoting

*Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir. 1989), *overruled in part by Saxton v. Am.*

*Tel. & Tel. Co.*, 10 F.3d 526, 533 n.12 (7th Cir. 1993))).  Post-complaint harassment is part of the

employer's "total response" and directly bears on whether the employer's actions were

"reasonably calculated to prevent further harassment."  Therefore, this Court did not err by

---

[18] The post-complaint harassment to which Williams was subjected included: (1)
discipline threats, (Tr. Transcript, Williams Testimony at 92-100); (2) shift-change threats, (*id.* at
111-13); (3) the denial of a lunch break, (*id.* at 100); (4) a negative review, (*id.* at 101); (5) the
assignment of seven partners in quick succession, (*id.* at 147); and (6) being identified as the sole
complainant in Sergeant Wilkins's investigation, (*id.* at 156–58).

admitting evidence that Williams's supervisors harassed her because she complained about sexual harassment.[19]

Williams's emphasis on post-complaint harassment did not require this Court to issue the following limiting instruction that was proposed by the City:

> Ladies and gentlemen of the jury, this case does not include a claim of retaliation by the plaintiff. As a result, I instruct you that you may not consider any testimony or other evidence presented that plaintiff claims occurred solely as a result of her alleged complaints. You will only consider such testimony or other evidence presented that you find occurred because of plaintiff's gender.

(R. 121-2, Def.'s Mem. at 4.) This Court declined to give this instruction because it was "confusing and [] an inaccurate statement of the law." (Tr. Transcript at 984.) The limiting instruction is confusing because it explicitly injected Williams's dismissed retaliation claim into the trial even though the word "retaliation" or the term "post-complaint harassment" had never been mentioned. More importantly, it was an inaccurate statement of the law because the jury can consider post-complaint harassment when determining whether the City's total response to Williams's complaint was "reasonably calculated to prevent further harassment." *Wyninger*, 361 F.3d at 976. Thus, the City's proposed limiting instruction was properly denied.

## B. To/From Memorandum

The City asserts that this Court erred by admitting a To/From Memorandum into evidence. The City asserts that this memo was inadmissible and that, even if the memo was admissible, its late admission into evidence affected the City's substantial rights. This Court admitted the memo over the City's objection after the deliberating jury requested to see it. (Tr.

---

[19] This evidence was also relevant to whether Williams made a concerted effort to inform her supervisors about her hostile work environment. *See* Section I(B)(3), *supra*.

Transcript at 1107-11.) For the reasons provided below, we find that the memo was admissible and that its late admission did not affect the City's substantial rights.

### 1. Admissibility

The City asserts that the memo was inadmissible because: (1) Williams did not establish its authenticity; (2) it contained inadmissible hearsay; and (3) the danger of unfair prejudice substantially outweighed its probative value. We disagree with each of these assertions. First, Williams established that the memo was authentic. "Federal Rule of Evidence 901(b)(1) provides that an exhibit may be authenticated by testimony of a witness with knowledge that 'a matter is what it is claimed to be.'" *Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 924 (7th Cir. 2002) (quoting Fed. R. Evid. 901(b)(1)). Williams recognized the memo, testified that she wrote it, and testified that she gave it to Sergeant Caluris. (Tr. Transcript, Williams Testimony at 103.) Next, the memo did not contain inadmissible hearsay because it was offered, not for the truth of the matter asserted, but to prove that the City had notice that Williams believed her work environment was hostile.[20] *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004); *Dewick v. Maytag Corp.*, No. 03 C 1548, 2004 WL 1688744, at *1 (N.D. Ill. July 22, 2004). Finally, the probative value of the memo with respect to the City's notice is not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Civ. P. 403. The only danger of unfair prejudice identified by the City is the danger that the jury would decide that Williams's work environment was hostile because Williams suffered post-complaint

---

[20] The City did not request and this Court did not give the jury an instruction that the memo was only admissible for a limited purpose. Even if the failure to give this instruction was error, it was harmless. The truth of these statements had already been admitted through Williams's testimony, so there is only a minimal chance that the lack of a limiting instruction affected the outcome of the trial. *See Mihailovich*, 359 F.3d at 914.

harassment.[21]  This memo merely reiterated Williams's testimony about post-complaint harassment, so the danger created by introducing the memo was exceedingly limited.  Thus, this memo was admissible.

### 2. Timing

The City asserts that the memo's late admission affected its substantial rights because it was denied a full and fair opportunity to cross-examine Williams about the memo.  The record does not support this argument.  While the City claims that the Court's decision not to immediately admit the memo into evidence "discouraged it from adducing additional evidence" about the memo, (R. 121-2, Def.'s Mem. at 10), this Court did not instruct the City not to ask Williams any additional questions about the memo or about any other memos.[22]  As this Court stated when admitting the memo, this Court never determined that the memo was inadmissible, so the City had a full opportunity to make "whatever record" it wanted.  (Tr. Transcript at 1110.)  While it is unusual to admit evidence after a jury starts deliberating, the City was not prejudiced by its admission because it had a full and fair opportunity to cross-examine Williams.

---

[21]  The City speculates that the jury's request to see the memo is evidence that the jury decided that Williams's work environment was hostile because Williams suffered post-complaint harassment.  (R. 121-2, Def.'s Mem. at 9.)  While the jury's request for the memo indicates that it was interested in it, only the jury knows why it wanted to see the memo or what role the memo played in its deliberations.  Furthermore, the minimal danger of unfair prejudice created by the lack of a limiting instruction undermines the City's speculation.

[22]  This Court did subsequently instruct the City not to ask a different witness about the contents of Williams's memo because the memo was not in evidence, but that ruling could not have affected the City's cross-examination of Williams.  (Tr. Transcript, Bialis Testimony at 392-93.)

Furthermore, the City cross-examined Williams on the memo's contents and repeatedly used her answers in its closing arguments.[23] On cross-examination, the City asked Williams whether the memo specifically mentions pornography or Rich Heinosch and whether the memo has a signature line or an approval line. (Tr. Transcript, Williams Testimony at 185-86.) Williams answered "no" to all of these questions. (*Id.*) The City then discussed this testimony three times during its closing argument:

> You heard the plaintiff testify that she had heard rumors and was concerned about whether or not her shift would change; and it is after this that she admits she wrote a memo that talked about her hours. But, remember, she said that that memo did not mention the word pornography. That memo did not mention the word Heinosch.
>
> . . .
>
> She talked about work hours; and, again, remember she admitted in that memo she wrote about work hours, she didn't put in pornography and she didn't say anything about Rich Heinosch.
>
> . . .
>
> Now, plaintiff says she drafted the to-from to Hiram Grau and she admits that she never gave it to him, and that's - the evidence shows that must be the case because there wasn't even a signature line on this memo; but, again, as plaintiff admits, the to-from she supposedly drafted at the time makes no reference to pornography or to Rich Heinosch.

(Tr. Transcript, City's Closing Argument at 1049, 1053, 1054.) Williams's counsel only discussed the contents of the memo – although he mentioned the memo three times during his closing argument, (Tr. Transcript, Williams's Closing Argument at 1001, 1006, 1007)—when rebutting the City's argument that the memo did not "say anything about Rich Heinosch:"

> Take a look at the memo. You refer to that to-and-from memo. What they didn't want to tell you is that it's entitled Hostile Work Environment. Maybe she didn't

---

[23] Williams's counsel asked Williams one question about the memo's contents. (Tr. Transcript, Williams Testimony at 104.) This Court sustained the City's hearsay objection and instructed her not to "go any further into a description of the memo beyond the reference." (*Id.*) Williams responded that the reference line referred to "[t]he porn, comments, the ICAM." The City did not object to Williams's answer or seek to have it stricken. (*Id.*)

use pornography, but she used hostile work environment, which is the very words that they used in the memo that says that sexually hostile environment[s] can be a hostile environment. That's what the memo says.

(Tr. Transcript, Williams's Rebuttal Argument at 1076.) The City placed the contents of the memo at issue, so cannot complain when the contents of the memo are subsequently introduced into evidence.[24] *See United States v. Moore*, 115 F.3d 1348, 1358 (7th Cir. 1997). Thus, the late admission of this memo did not affect the City's substantial rights.

## C. Pornographic Images

The City asserts that this Court erroneously permitted the jury to see the pornographic images that Detective Novitovic attached to his report. Pornographic images create a danger of unfair prejudice because they can "assail the senses and distract the mind." *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1142 (7th Cir. 1985). This danger did not, however, substantially outweigh the pornographic images's probative value.

---

[24] The City even highlighted the memo's contents during its opening statement:

The evidence will show that plaintiff drafted a memorandum to Commander Hiram Grau which she dated November 28th, 1999, and in that memorandum, she outlined her work concerns at Homan Square. The evidence will show that Commander Grau never received that memorandum. The memorandum mentions nothing about Internet pornography. It does mention plaintiff's concerns about working nighttime hours.

(Tr. Transcript, City's Opening Statement at 41.) Williams's counsel only stated during his opening statement that Williams gave Sergeant Caluris a memo complaining about "the sexual harassment, hostile environment that was taking place in Homan Square . . . ." (Tr. Transcript, Williams's Opening Statement at 26.) He did not discuss the contents of the memo, but limited his remarks to the existence of the memo, the memo's reference line, and the fact that Williams gave the memo to Sergeant Caluris.

21

The admission of these pornographic images created a limited danger of unfair prejudice that did not substantially outweigh the images' probative value. First, the jury only saw three pages of images out of the thousands that Detective Novitovic recovered. (Tr. Transcript, Novitovic Testimony at 317, citing Ex. 160, Bates # 4864-66.) Second, these images were only shown to the jury in the jury room. They were not exhibited during trial. Third, the jury was aware that Williams never saw these particular images.[25] (*Id.* at 318, 333; City's Closing Argument at 1043-44, 1067.) While the City asserts that the photos have minimal probative value because Williams never saw them, these images were still probative of other issues. They were relevant to the severity of the pornography in the Chicago Police Department, relevant to whether the City should have known about the pornography, and relevant to whether the City's investigation was reasonable. Furthermore, these images were found on a computer in Williams's Area 2 workplace, so are also examples of the types of images her immediate co-workers were viewing. As this Court stated during the trial, the images were "within the range of potential photographs that she could have seen." (Tr. Transcript at 1104.)

Finally, Williams submitted these images because she could not present any of the actual images she saw. Her inability was the direct result of the City's failure to produce any of the relevant computers or recover any data from the relevant time periods. The City did not produce

---

[25] Williams's counsel acknowledged during his rebuttal that Williams never saw these images, but made one statement during his closing argument that indicated that she had seen them. He asked whether a "reasonable person would conclude that sex with animals is the kind of thing that should be in a workplace" even though Williams never testified that she saw any such images. (Tr. Transcript, Williams's Closing Argument at 988.) He mentioned these images two more times, but neither time did he imply that Williams had seen them. He stated that they indicated that Williams's work environment was severely hostile (they are relevant to the types of images Williams's co-workers were viewing) and stated that they indicated that the City's investigation was not reasonable. (*Id.* at 1014, 1027.)

any of the Homan Square computers. It only analyzed one computer in Area 2—and the data on that computer had been intentionally destroyed when an unknown person installed a program designed to destroy evidence of internet browsing. (Tr. Transcript, Novitovic Testimony at 298, 302-03.) Thus, the images attached to Detective Novitovic's report were the most probative alternative to the actual images to which Williams was exposed. For all of these reasons, the limited danger of unfair prejudice did not substantially outweigh the images' probative value.[26]

## CONCLUSION

The jury is the heart of our judicial system, so we accord jury verdicts great deference. The jury verdict entered in this case is supported by sufficient evidence as well as the manifest weight of the evidence, and none of this Court's trial rulings affected the City's substantial rights. Thus, the City's motions for a judgment as a matter of law and a new trial are wholly denied. (R. 120-1; R. 121-1.) The jury's verdict stands, so the City must pay Williams seventy-nine thousand dollars in damages.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: February 9, 2005**

---

[26] The City also states in the final footnote of its brief that it would accept a remittitur as an alternative to a new trial because the jury's award bears no rational connection to the evidence. (R. 121-2, Def.'s Mem. at 14 n.8); *Int'l Fin. Servs. Corp. v. Chromas Tech. Canada, Inc.*, 356 F.3d 731, 739 (7th Cir. 2004) (stating that a damage award that is not rationally connected to the evidence is a "rare instance[]"). We disagree. Other than repeating its argument that Williams's claim is supported by a "paucity of evidence," the City provides no analysis. (R. 121-2, Def.'s Mem. at 14 n.8.) Williams submitted evidence of her actual and compensatory damages, and the jury's damage award is rationally connected to that evidence.